# United States Bankruptcy Court

# District of Massachusetts

_____ )
In re:                                      )    Chapter 11
                                            )    Case No. 05-40809-HJB
ACCESS CARDIOSYSTEMS, INC.,                 )
                                            )
        Debtor                              )
_____ )

## MEMORANDUM OF DECISION

Before the Court is the "Debtor's Omnibus Objection to General Unsecured Claims Asserted by European Distributors" (the "Objection" or "Objection to Claims") filed by Access Cardiosystems, Inc. (the "Debtor"). The Objection and various supplementary memoranda filed by the Debtor and the claimants raise several issues of contract law and interpretation. The Debtor asks this Court to disallow the claims in their entirety as foreclosed by various provisions of agreements between the Debtor and the claimants. The claimants, in turn, ask this Court to conduct an evidentiary hearing to determine factual issues regarding the Debtor's alleged breach of the contracts and the amount of damages resulting from that breach.

I.    FACTS AND TRAVEL OF THE CASE

A.    **The Distribution Agreements**

The present controversy arises from several distribution agreements (the "Agreements") executed by the Debtor and various European distributors[1] (the "Distributors") during the latter part of 2001 and the early part of 2002, several years prior to the filing of the instant Chapter 11 bankruptcy case.   Under the Agreements, the Distributers were granted exclusive rights to market and sell the Debtor's automated external defibrillators ("AEDs" or "Access AEDs")[2] within their respective territories throughout Europe.[3]

Section 3 of the Agreements detailed various obligations of the Distributors, including promotion, marketing, minimum commitments and training criteria. In addition, under Section 3.17, except as otherwise provided or agreed to in writing by the Debtor and a Distributor, the Distributors bore "all costs and expenses incurred in the performance of Distributor's obligations under th[e] Agreement[s]."  In return, the Distributors each received

_____

[1] The Distributors are: Donna ehf, Innomed Medical, Inc. ("Innomed"), GS Elektromediziniscghe Gerate G. Stemple GmbH ("GS Elektromed"), Kivex, Mortara Rangoni Europe SRL ("Mortara Rangoni"), Ortho-Medical, Fenno Medical Oy ("Fenno Medical"), R.L. Dolby & Co. Ltd. ("Dolby"), Reavita, AG ("Reavita") and Schiller-Austria ("Schiller").

[2] For an exceedingly more detailed account of the Debtor's history, including the development of the AEDs, see Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.), 340 B.R. 127 (Bankr. D. Mass. 2006).

[3] The Agreements are all substantially similar; however, differences between certain cited portions of the Agreements do exist and will be noted.  Furthermore, the Agreements with Ortho-Medical and Fenno Medical have not been produced.  For purposes of the present controversy, however, the parties appear to be in agreement that the differences between the Agreements are not material and the missing Agreements are substantially identical to the ones produced.

2

a limited license of the Debtor's intellectual property rights to sell the AEDs exclusively within their respective European territories.

The initial term of each Agreement was two years, unless terminated pursuant to Section 11.  Under Section 11.2, either party could terminate the Agreement for cause,[4] and under Section 11.3, either party could terminate the Agreement with or without cause, provided that written notice was given of the termination six months prior to the effective date of the termination.  The Agreement further limited liability with respect to terminations under Section 11 of the Agreement.[5]

---

[4] More particularly, that section provided:

11.2   Termination for Cause.  Either party may terminate this Agreement at any time prior to the expiration of its stated term in the event that:

(a)   the other party fails to perform any other obligation, warranty, duty or responsibility or is in default with respect to any term or condition undertaken under this Agreement and such failure or default continues unremedied for a period of twenty (20) days following written notice of such failure or default;

(b)   Access CardioSystems in its sole discretion terminates Distributor's rights under this Agreement pursuant to Section 3.3 [setting forth minimum commitments requirements] of this Agreement; or

(c)   any bill or regulation granting Distributor extracontractual compensation upon termination or expiration of this Agreement is introduced into or passed by the legislature or other governing body of the Territory.

[5] Section 11.6 of the Agreements provides, in relevant part:

11.6   No Damages for Termination or Expiration.  NEITHER ACCESS CARDIOSYSTEMS NOR DISTRIBUTOR SHALL BE LIABLE TO THE OTHER FOR DAMAGES OF ANY KIND, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ON ACCOUNT OF THE TERMINATION OR EXPIRATION OF THIS AGREEMENT IN ACCORDANCE WITH THIS SECTION 11. . . . Neither Access CardioSystems nor Distributor will be liable to the other on account of termination or expiration of this Agreement for reimbursement or damages for the loss of goodwill, prospective profits or anticipated income, or on account of any expenditures, investments or leases or commitments made by either Access CardioSystems or Distributor or for any other reason whatsoever based upon or

3

Each Agreement also disclaimed all warranties relative to the Access AEDs, with the exception of limited warranties extended  to the ultimate end-users of the product.[6]  In addition to excluding warranties, Section 15 of the Agreements also limited the parties' liability in the event of breach:

---

growing out of such termination or expiration. . . .

[6] Section 14 of the Agreement between the Debtor and Donna ehf, labeled "**DISCLAIMER OF WARRANTIES**," provided:

> 14.1    Disclaimer of Warranties. ACCESS CARDIOSYSTEMS MAKES NO WARRANTIES OR REPRESENTATIONS AS TO PERFORMANCE OF THE ACCESS CARDIOSYSTEMS PRODUCT TO DISTRIBUTOR; BUT SHALL MAKE WARRANTIES ONLY TO END USERS OF THE ACCESS CARDIOSYSTEMS PRODUCT.  ACCESS CARDIOSYSTEMS HEREBY DISCLAIMS ALL WARRANTIES REGARDING THE ACCESS CARDIOSYSTEMS PRODUCT, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

Section 14 of the Agreements between the Debtor and Innomed, GS Elektromed, Kivex, Mortara Rangoni, Dolby, Reavita and Schiller, also labeled "**DISCLAIMER OF WARRANTIES**," was substantially similar and provided:

> 14.1    Disclaimer of Warranties. ACCESS CARDIOSYSTEMS MAKES NO WARRANTIES OR REPRESENTATIONS AS TO PERFORMANCE OF THE ACCESS CARDIOSYSTEMS PRODUCT TO DISTRIBUTOR; BUT SHALL MAKE WARRANTIES ONLY TO END USERS OF THE ACCESS CARDIOSYSTEMS PRODUCT. A COPY OF THE WARRANTY FOR END USERS OF THE ACCESS CARDIOSYSTEMS PRODUCT THAT IS IN EFFECT ON THE DATE OF THIS AGREEMENT IS ATTACHED AS EXHIBIT D. ACCESS CARDIOSYSTEMS RETAINS THE RIGHT TO REVISE SUCH WARRANTY AT ITS OWN DISCRETION. ACCESS CARDIOSYSTEMS HEREBY DISCLAIMS ALL WARRANTIES TO DISTRIBUTORS REGARDING THE ACCESS CARDIOSYSTEMS PRODUCT, EXPRESS AND IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

4

**15.    LIMITED LIABILITY**

15.1    <u>Limitations and Exclusions</u>.   REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN OR ACCESS CARDIOSYSTEMS'S LIMITED WARRANTY ACCOMPANYING DELIVERY OF THE ACCESS CARDIOSYSTEMS PRODUCT FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE, NEITHER PARTY WILL BE LIABLE FOR ANY LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR OTHER SPECIAL DAMAGES SUFFERED BY DISTRIBUTOR, ITS CUSTOMERS OR OTHERS ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE ACCESS CARDIOSYSTEMS PRODUCT, FOR ALL CAUSES OF ACTION OF ANY KIND (INCLUDING TORT, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY AND BREACH OF WARRANTY) EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

15.2    <u>Maximum Aggregate Liability</u>.   IN NO EVENT WILL ACCESS CARDIOSYSTEMS'S TOTAL CUMULATIVE LIABILITY IN CONNECTION WITH THIS AGREEMENT OR THE ACCESS CARDIOSYSTEMS PRODUCT, FROM ALL CAUSES OF ACTION OF ANY KIND, INCLUDING TORT, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY AND BREACH OF WARRANTY, EXCEED THE TOTAL AMOUNT PAID BY DISTRIBUTOR TO ACCESS CARDIOSYSTEMS HEREUNDER.

15.3    <u>Acknowledgment.</u>   Distributor agrees that the limitations of liability and disclaimers of warranty set forth in this Agreement are independent of any remedies hereunder and apply regardless of whether any remedy fails of its essential purpose. Distributor acknowledges that Access CardioSystems has set its prices and entered into this Agreement in reliance on the disclaimers of liability, the disclaimers of warranty and the limitations of liability set forth in this Agreement and that the same form an essential basis of the bargain between the parties.

Given the nature of the AEDs and the regulations imposed by the United States

Food and Drug Administration (the "FDA"), it is unsurprising that the Agreements also

contained provisions regarding the parties' rights and obligations in the event of a recall.

The relevant provisions of Section 9 of the Agreements provide:

9.2    <u>Notification by Access CardioSystems</u>.   If a product investigation by a party or government office or agency results in a potential product recall or correction of the Access Cardiosystems Product, Access CardioSystems shall retain full authority and responsibility for decisions on

5

such recall or correction.  If Access CardioSystems decides to conduct a recall or correction, Access CardioSystems will provide written notice to Distributor within twenty-four (24) hours of such decision, and a summary of the reason for and implementation of such action.  Access CardioSystems shall provide such information as Distributor may reasonably require to prepare any additional customer notification of such recall or correction, which notification shall be issued by Distributor.

9.3    Procedure.  Any such recall, correction or notification shall be handled in accordance with the recall, correction and customer notification policy and procedures maintained by Access Cardiosystems.  Access CardioSystems shall promptly reimburse all reasonable, necessary and documented costs for any recall of the Access CardioSystems Product that are incurred by Distributor with the prior approval of Access CardioSystems.[7]

**B.    The Recall**

In October of 2004, the Debtor learned of potential problems with the AEDs that eventually led to the issuance, on November 3, 2004 of its "Urgent Recall Notice" (the "Recall Notice").  The Recall Notice was mailed to customers and the Distributors, and provided:

**URGENT RECALL NOTICE - IMMEDIATE ACTION REQUIRED**
**Access CardioSystems, Inc.'s Access AED and AccessALS Automated External Defibrillators**

November 3, 2004

Dear Customer:

According to our records, you have purchased one or more of Access CardioSystems, Inc.'s ("Access CardioSystems" or the "Company")

---

[7] This language is identical in the Agreements between the Debtor and Innomed, GS Elektromed, Kivex, Mortara Rangoni, Dolby, Reavita and Schiller. Section 9.3 of the Agreement with Donna ehf differed from this provision as follows:

9.3    Procedure.  Any such recall, correction or notification shall be handled in accordance with the recall, correction and customer notification policy and procedures maintained by Access CardioSystems in accordance with the FDA Correction and Removals Regulation of 1997 (and any successor thereto) and any other applicable law, rule or regulation.

6

AccessAED or AccessALS automated external defibrillator ("AED") devices. The Company has become aware of two potential issues involving certain of its AEDs that warrant your immediate attention. . . .
. . .

**PLEASE IMMEDIATELY DISCONTINUE USE OF AND REMOVE FROM SERVICE ACCESS CARDIOSYSTEMS AED DEVICES WITH THE ABOVE REFERENCED CATALOG AND SERIAL NUMBERS**

**IMPORTANT: Certain of the AccessAED or AccessALS AEDs in your possession may have one, both, or neither of the issues described above. However, the Company has made a business decision, effective November 3, 2004, to discontinue manufacturing and marketing ALL models of its AEDs and to discontinue supporting its AEDs that are currently in the field. We are no longer accepting orders for disposable parts used with our AEDs. Therefore, when your supply of disposable parts is depleted, please immediately discontinue use of and remove from service all of the Company's AEDs that you have in your possession. It is your responsibility to equip yourself with AEDs that meet your medical needs.**

\* \* \*

Please immediately sign and return the attached form by facsimile to Access CardioSystems . . . indicating that you have received and understand this letter.

The Food and Drug Administration is being notified of this voluntary recall.

We regret any inconvenience that this action may cause. If you have any questions about this letter, please contact the Recall Coordinator at [phone number provided].[8]

The details of the events precipitated by this Recall Notice are the subject of some

dispute between the parties. According to the Distributors, they made numerous attempts

to contact the Debtor following receipt of the Recall Notice, but claim that the Debtor was

"totally non-responsive. Phone calls and correspondence from the European Distributors

---

[8] In addition to the above-quoted language, the Recall Notice also detailed the potential problems identified by the Debtor with various AEDs and provided the specific serial numbers associated with the affected devices.

7

were completely ignored."  Two Distributors claim to have submitted "formal notices" requesting reimbursement of costs associated with the recall, as provided by Section 9.3 of the Agreements.   Relevant documents attached to the Distributors' supplemental response to the Objection (the "Distributors' Supplemental Response") include: (1) a letter to the Debtor from Reavita dated November 14, 2004; (2) a letter to the Debtor from Arthur M. Dolby ("Arthur Dolby"), Dolby's managing director, dated November 22, 2004; and (3) a second, undated, letter to the Debtor from Arthur Dolby. Both Reavita and Dolby raised concerns regarding their inability to contact the Debtor and both referenced Section 9.3 of the Agreements and the required approval of costs associated with the Recall.  The Reavita letter stated, in relevant part:

> Dear Sir,
>
> Accesscardiosystems sent us by courier an information dated November 3, 2004, about a Recall of Access products.
> . . .
>
>   • There are two different "Recall phone numbers" mentioned. By today, none of our calls has been answered personally neither is it possible to leave a message.
>
>   • Calling the Recall phone number provided by Access, we are addressed to the Access homepage for further information.
> . . .
>
> In our mutually signed International Exclusive Distributor Agreement, point 9, it is specified, what to do with Recalls initiated by Accesscardiosystems.
> . . .
>
> In Point 9.3 "Procedure" is written, that AccessCardiosystems shall promptly reimburse all reasonable, necessary and documented cost for any recall of the Access Cardiosystems Product that are incurred by Distributor. Kindly ask you where to address our costs and how and when we shall be reimbursed for.
> . . .

8

> Please inform . . . who is an authorized contact person for us at Accesscardiosystems and how to contact him/her.
>
> . . .

Likewise, the November 22, 2004 letter from Arthur Dolby stated:

> . . .
>
> I refer you to section 9.3 of the Access Distribution Contract . . . .
>
> . . .
>
> Please give approval in principle for the costs incurred in connection with the recall.  These costs will be detailed after the recall is complete but will cover the labour, transport costs and any other expenses involved in recalling the units specified.  It will also include the refund cost where a customer claims for a refund of what he paid for his Access AED.  Your recall states that the AED is to be taken out of use and Access will not be 'reconciling' units returned.  We will only return units if Access agree to cover the freight of the AEDs recalled and arrange for their uplift.
>
> Please clarify the above and make clear what Access is prepared to pay in relation to the commitment made in Section 9.3 above.
>
> . . .

It also appears that other European Distributors were unsure of how to proceed following the issuance of the Recall Notice.  In the second letter from Arthur Dolby to the Debtor, he states,

> . . .
>
> I have been in conference with many of the European Distributors over the last 10 days . . . .
>
> . . .
>
> Many of us are highly suspicious about the circumstances surrounding the recall notice and the Access decision to cease trading . . . .
>
> Although we have had acknowledgments of messages left, Access is not answering questions asked and merely direct callers to their web site. . . .
>
> . . .
>
> Could I ask you to acknowledge receipt of this letter . . . ? Your help and assistance would be very much appreciated.
>
> . . .

Case 05-40809    Doc 395    Filed 02/16/07    Entered 02/16/07 13:25:13    Desc Main
Document    Page 10 of 38

The Debtor, in turn, disputes the Distributors' assertions that it was unresponsive to the Distributors. Describing the circumstances surrounding the recall, the Debtor says that, although its production and sales staff were laid off, it retained necessary personnel and "took other measures to ensure its response to the recall was prompt and efficient."[9] As further evidence of its responsiveness to the Distributors following the issuance of the Recall Notice, the Debtor has produced copies of post-recall agreements executed by the Debtor and the Distributors.[10]

### C.    The Bankruptcy, the Claims and the Objection

On February 8, 2005, the Debtor filed for protection under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. § 101 et al., and has operated as a debtor in possession since the inception of the case, see 11 U.S.C. §§ 1107(a), 1108. On June 20, 2005, this Court issued an order establishing July 29, 2005 as the bar date for non-governmental entities to file proofs of claim in the Debtor's case (the "Bar Date Order"). See Fed. R. Bankr. P. 3003(c)(3). Pursuant to the Bar Date Order and the "Notice of Deadline and Procedures for Filing Proofs of Claim" (the "Bar Date Notice"), claims were to be filed with Kurtzman Carson Consultants, LLC ("KCC"), the Debtor's claims and noticing agent. Although the Distributors' claims (the "Claims") were timely filed on July 27,

---

[9] In its First Supplemental Memorandum, the Debtor further reiterates this position:

After laying off all of its non-essential personnel not related to the recall, the Debtor . . . maintained a sufficient staff in its finance, operations, engineering and support staff to ensure that all of the necessary notices were sent out, to work with the FDA, to respond to customer questions, to attempt to determine the root cause of the problem.

[10] As noted by the Debtor, the post-recall agreements appear to be, in substance, irrelevant to the issues presently before the Court, and the Debtor relies on those agreements only to the extent they evidence the Debtor's post-recall responsiveness to the Distributors' concerns.

2005, each of the Claims (with the exception of GS Elektromed) was filed directly with the clerk of the Bankruptcy Court and not with KCC.

For each of the Claims, in the portion of the proof of claim form labeled "Basis for Claim," there was a mark next to the box labeled "Other" and the words "Product recall/see attached" were typed in.  Attached to each Claim is an "estimate" of costs associated with the recall, which include expenses associated with (1) "lawyers"; (2) information/mailings to customers; (3) management and other personnel time; (4) technical tests; (5) prospective expenses for testing; (6) expenses for repairs and replacement; (7) "logistics"; (8) warranty claims; (9) stock and warehouse depreciation; (10) image damage; (11) "loss of delivery"; (12) compensation for damages ("withdrawal of tenders"); and (13) additional costs associated with reimbursing customers for returns of the AEDs.[11]  Each Claim is classified as a general unsecured claim, ranging from $109,500.00 to $2,266,695.00.[12]

On November 14, 2006, the Debtor filed its Objection, the Distributors responded on January 11, 2007 (the "Distributors' Response") and the Debtor thereafter filed a

---

[11] The estimates of expenses associated with the claims appear to have been completed on a standardized form.  Thus, not all of the Distributors claimed amounts in all categories. Because the parties have addressed their arguments globally, and for ease of discussion, the Court will not, at this juncture, detail each separate expense claimed by each distributor.

[12] The total amounts claimed for each distributor are as follows:
Donna ehf: $263,808.00
Innomed: $699,079.87
GS Elektromed: $479,457.62
Kivex: $303,196.00
Mortara Rangoni: $1,056,126.00
Ortho-Medical: $33,086.25
Fenno Medical: $109,500.00
Dolby: $1,807,239.00
Reavita: $2,266,695.00
Schiller: $1,434,694.00.

supplemental memorandum of law (the "Debtor's First Supplemental Memorandum").

After a hearing on the Objection and response thereto, held on January 18, 2007, the Court

took the matter under advisement and invited the Distributors to file a further response.

The Distributors' Supplemental Response was filed on February 1, 2007, and the Debtor

was granted leave to file a reply on February 7, 2007 (the "Debtor's Second Supplemental

Memorandum").  Although the Court finds that issues of material fact preclude a final ruling

on the Objection, this memorandum should now dispose of certain legal issues raised by

the parties and focus the Debtor and the Distributors on the issues of fact remaining to be

established at trial.[13]


II.    POSITIONS OF THE PARTIES

        The Debtor and the Distributors have raised various legal and factual arguments

relative to the Claims and the Objection.   Generally, the various positions may be

categorized as those relating to: (1) procedural deficiencies in the filing of the Claims; (2)

contractual limits on liability and remedies, and the failure of contractual remedies' essential

purpose; (3) breach of contract, including breach of the Debtor's obligations of good faith

and fair dealing; and (4) indemnification.   On each of these issues, the Debtor essentially

maintains that its Objection may be sustained now as a matter of law, while the Distributors

---

[13] The Court acknowledges that the parties have made valiant efforts to flush out the complex legal and factual issues within a somewhat shortened time-frame, as also pending before this Court is the Debtor's motion to approve its disclosure statement, the Debtor's Chapter 11 plan of reorganization and a motion to dismiss filed by the Committee of Unsecured Creditors, each of which is currently scheduled for hearing on March 6, 2007.

argue that material issues of fact exist that must be decided before the Court can properly enter a dispositive ruling on the Objection.

### A.    Procedural Objections

The Debtor objects to certain of the Distributors' Claims on two procedural grounds. First, the Debtor argues that the Claims that were not filed with KCC in accordance with the Bar Date Order and Bar Date Notice should be disallowed on grounds that they were not timely and properly filed.[14]  Second, the Debtor notes that several of the Claims were filed by the Distributors' attorney in the absence of a notice of appearance on the Distributors' behalf and without  attached powers of attorney.[15]  Accordingly, says the Debtor, the attorney lacked the requisite authority to execute the Claims on behalf of those Distributors and the Claims are thus invalid and should be disallowed.

The Distributors concede that the proofs of claim, as originally filed, may have lacked evidence of the attorney's authority in strict compliance with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). However, in conjunction with their responses to the Objection, the Distributors filed the requisite powers of attorney, and counsel for the Distributors has now filed a notice of appearance on behalf of all the Distributors.  Accordingly, the Distributors seek leave to amend the proofs of claim to include evidence of the filing attorney's authority to execute the Claims.

---

[14] As noted earlier, only GS Elektromed's claim was filed with KCC.

[15] The proofs of claim filed by GS Elektromed, Schiller and Dolby evidenced the requisite authority; however, the remaining proofs of claim did not, as an official notice of appearance by the filing attorney had not been entered on behalf of those Distributors and no power of attorney was attached to the claims.

13

The Distributors also acknowledge their failure to comply with the terms of the Bar Date Order and Bar Date Notice by filing their proofs of claim directly with the clerk of the Bankruptcy Court, and not with KCC, the Debtor's claims agent.  The Distributors argue that this oversight does not render the Claims invalid, as it was a result of excusable neglect and has not prejudiced the Debtor nor has it caused any delay in these judicial proceedings.  The Debtor concedes that, from the inception of the case, it has been aware of, and in fact has engaged in negotiations regarding, the Distributors' claims.

### B.     Liability and Damages, Remedies and Failure of Essential Purpose

The Debtor's Objection is largely based on provisions of the Agreements that limit the parties' liability, remedies and recovery of incidental and consequential damages. Assuming the Distributors can establish that the Debtor breached its obligations under the Agreements, the Debtor nevertheless argues that the Distributors are foreclosed from recovering all or a majority of the damages they now assert.  First, according to the Debtor, the Distributors' sole remedy in the event of a breach was to terminate the Agreements in accordance with Section 11, which section provided that neither party would be liable for damages of any kind on account of such termination.

Second, under Section 14, the Debtor expressly disclaimed all warranties and, under Section 15, the Debtor limited its liability to exclude incidental and consequential damages in the event of a breach.  Therefore most, if not all, of the Distributors' damages are precluded by those sections, as the claimed damages represent classic incidental and consequential damages.

The Distributors take issue with the Debtor's reliance on the damages exclusion found in Section 11.6, because, they assert, the Debtor never effected a termination in

14

accordance with Section 11.2.  Instead, the Distributors rely on the Debtor's breach of

Section 9.3 as the basis for their claims, which breach would remain unaffected by the

limitations found in Section 11.6.

The Distributors further argue that termination of the Agreements as sole remedy

for the Debtor's breach fails of its essential purpose under the circumstances.  Relying on

Section 2-719 of the Uniform Commercial Code, the Distributors say that termination of the

Agreements would ultimately result in their having no minimum adequate remedy, a result

viewed with disfavor by many courts and commentators.

The Debtor counters that the doctrine of failure of essential purpose is simply

inapplicable to the present case, since the Distributors specifically contracted to assume

the very risks that came to fruition.  Moreover, even if the remedy of termination was found

to have failed of its essential purpose, that failure would not negate the limits on incidental

and consequential damages provided by Section 15 of the Agreements.  Again, assuming

that  a majority, if not all, of the Distributors' claimed damages represent incidental and

consequential damages, they are not recoverable pursuant to the Agreements.

###    C.    Breach of Contract

As clarified by counsel to the Distributors at the hearing on the Objection, the

Distributors' Claims do not arise from the defects in the AEDs.  Instead, the Distributors

base their Claims on the Debtor's alleged breach of the Debtor's obligations in the event

of a recall, as provided by Section 9.3.  The Distributors argue that the Debtor may have

breached Section 9.3 by failing to conduct the recall in accordance with "the recall,

correction and customer notification policy and procedures maintained at Access

CardioSystems," as required by that section.  The Distributors also assert that the covenant

15

of good faith and fair dealing imposed on all contracts under Massachusetts law obligated the Debtor to not unreasonably withhold approval of costs associated with the recall, as provided by Section 9.3 of the Agreements.   The Distributors point to the Debtor's unresponsiveness to the Distributors' communications following the issuance of the Recall Notice as evidence that the Debtor abrogated its responsibility to approve costs associated with the recall.

The Debtor disputes these allegations in two major respects.   First, the Debtor unequivocally asserts that its actions with regard to the recall were fully in accord with its policy and procedures.   Second, the Debtor claims that it was not unresponsive to the Distributors following the recall and, in fact, the post-recall agreements evidence the continuing cooperation and communication between the Debtor and Distributors regarding issues involving the recall.

Furthermore, says the Debtor, none of the Distributors submitted requests for approval of costs in accordance with Section 9.3 of the Agreements. According to the Debtor, the letters appended to the Distributors' Supplemental Response cannot be considered requests for prior approval for two major reasons.  First, the communications provide no documentation, and do not demonstrate the reasonableness or necessity, of specified costs associated with the recall.  Instead, the Debtor characterizes the letters as seeking "blank check" approval of any expenses that might be incurred.  The Debtor states that it "had no obligation to approve anything before it knew exactly what was being requested."  Thus, it did not breach its obligations of good faith related to the approval of costs to be reimbursed, because it was the Distributors, and not the Debtor, who failed to abide by the terms of the Agreements.

16

Second, the Debtor notes that the attached letters purporting to request approval for expenses associated with the recall were not sent in compliance with Section 18.3 of the Agreements, which specifies the manner in which all notices and demands are to be sent. The Debtor says the letters were not compliant with Section 18.3, a fact which, according to the Debtor, renders those requests ineffective under Section 9.3.

### D.    Indemnification

Apart from reliance on recovery of damages for breach of contract, the Distributors also argue that they have common law indemnification claims against the Debtor for sums the Distributors paid to settle claims with end-users of the AEDs.    According to the Distributors, they "have a right to seek indemnification against [the Debtor] as a result of [the Debtor's] negligent manufacture and also as a result of the fact that [the Debtor] refused to honor its limited warranty obligations to end-users, for their liability to the end-users."

The Debtor says that principles of common-law indemnification are inapplicable here, as the damages suffered by the Distributors are purely economic.    Relying on the cases cited by the Distributors, the Debtor argues that "common law indemnification applies only where there is 'injury,' and not economic loss."    Thus, indemnification, according to the Debtor, is not available to the Distributors for recovery of the amounts paid to settle claims with end-users.

III.    DISCUSSION

    **A.    Procedural Issues**

    As an initial matter, the Court must determine whether the procedural errors in the Distributors' proofs of claim preclude their viability.  For if the Claims are invalid for technical reasons, the substantive issues raised are moot.

    1.    <u>Authorization</u>

    As the Debtor rightly notes, § 501(a) of the Bankruptcy Code provides that a creditor may file a proof of claim, 11 U.S.C. § 501(a), and Bankruptcy Rule 3001(b) requires a proof of claim to be executed by "the creditor or the creditor's authorized agent . . . ." Fed. R. Bankr. P. 3001(b).  Where an attorney files a claim on a creditor's behalf, the authorization for such filing may be established in two ways.  If the attorney has filed a notice of appearance on a creditor's behalf, that attorney is presumed to be authorized to a proof of claim for the creditor. <u>See</u> <u>In re Trebol Motors Distrib. Corp.</u>, 220 B.R. 500 (B.A.P. 1st Cir. 1998).  Alternatively, an attorney may attach a power of attorney executed by the Creditor to the official proof of claim form. <u>See</u> Official Form 11A.

    Although, as initially filed, some of the Claims failed to evidence the filing attorney's requisite authority, that deficiency has now been resolved by the filing of powers of attorney executed by the Distributors and the filing of a notice of appearance by counsel to the Distributors.  There has been no argument or evidence that any party will suffer prejudice from allowing an amendment to the Claims to include the powers of attorney.  No party has suffered from a detrimental reliance on the Claims as originally filed.  Likewise, there is no evidence of bad faith, nor is there any question that the filing attorney did, in fact, have authorization from the Distributors to file the Claims on their behalf.  Therefore, to the

extent the Distributors seek authority to amend their proofs of claim to include the executed

powers of attorney, that request is granted. See Helen Gens & Assoc. v. Resolution Trust

Corp. (In re Gens), 112 F.3d 569, 575-76 (1st Cir. 1997); Unioil v. Elledge (In re Unioil,

Inc.), 962 F.2d 988, 992-93 (10th Cir. 1992).

                    2.    Failure to File the Claims with KCC

        Regarding the failure to file the proofs of claim with KCC, this Court also finds that

procedural error to be of little or no import and insufficient to render the Claims invalid. As

the Distributors have noted, although they failed to file their Claims with KCC, they did

indeed *timely* file the proofs of claim. Furthermore, the Debtor has conceded that it has

suffered no prejudice from the Distributors' filing of the Claims directly with the clerk of the

Bankruptcy Court. The Distributors argue that this error was the result of excusable neglect

and should not foreclose recovery on their Claims. The Court agrees.

        Applying the factors applicable to determining whether the doctrine of excusable

neglect should forgive the error in filing, the Court is guided by the United States Supreme

Court's analysis in Pioneer Investment Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S.

380, 395 (1993). Discussing "what sorts of neglect will be considered 'excusable,'" the

Court stated:

> we conclude that the determination is at bottom an equitable one, taking
> account of all relevant circumstances surrounding the party's omission.
> These include . . . the danger of prejudice to the debtor, the length of delay
> and its potential impact on judicial proceedings, the reason for the delay,
> including whether it was within the reasonable control of the movant, and
> whether the movant acted in good faith.

Id. There is no showing that the Debtor has been prejudiced or that judicial delay has

resulted. And there is no contention that the Distributors have acted with bad faith. Thus,

the only remaining question is whether the reason for the delay rises to the requisite level of "excusability."  See Graphic Commc'ns Inter'l Union, Local 12-N v. Quebecor Printing Providence, Inc., 270 F.3d 1, 5 (1st Cir. 2001) ("there must still be a satisfactory explanation for the late filing.").

The "excuse" given by the Distributors is that the attorney filing the Claims "inadvertently overlooked the instructions on the Bar Date Order which required all claims to be filed with KCC."  While merely "misreading" or overlooking specifics of a Court order may not, in the ordinary circumstance, excuse a late filing, see, e.g., Graphic Commc'ns, 270 F.3d at 6,[16] the circumstances here are unique.

Bankruptcy Rule 5005(a)(1) establishes that proofs of claim "shall be filed with the clerk in the district where the case under the Code is pending." Fed. R. Bankr. P. 5005(a)(1).  Furthermore, under the Massachusetts Local Bankruptcy Rules (the "Local Rules"), the Distributors were permitted to file proofs of claim electronically, as they did. Mass. Local Bankr. R. 9036-1.  In this case, however, the procedure for filing the proofs of claim fell outside the ordinary course of filings in this district.   Although this Court is reluctant to excuse filings in contravention of a clear order, such as the Bar Date Order issued in this case, given that: (1) the Claims were timely filed; (2) the Debtor received timely notice of the filing; (3) the Distributors filed the Claims in good faith and pursuant to

---

[16] The First Circuit has made clear that:

when a party's or counsel's misunderstanding of clear law or misreading of an unambiguous judicial decree is the reason for the delay in filing . . ., we have continued to uphold findings of "no excusable neglect" where the court cited the absence of unique or extraordinary circumstances.

Graphic Commc'ns, 270 F.3d at 6.

20

the Bankruptcy Rules and the Local Rules; and (4) no prejudice or delay has resulted, the

Court finds that the failure to file the Claims with KCC was the result of excusable neglect.

Any other result would be grossly inequitable.

**B.    Applicable Law**

While the Distributors' proofs of claim are *prima facie* evidence of the validity and

amount of the Claims, Fed. R. Bankr. P. 3001(f); Factors Funding Co. v. Fili (In re Fili), 257

B.R. 370, 372 (B.A.P. 1st Cir. 2001), the Debtor has provided sufficient evidence to rebut

that *prima facie* case.  See Juniper Dev. Group v. Kahn (In re Hemingway Transport, Inc.),

993 F.2d 915, 925 (1st Cir. 1993); In re Lowenstein, -- B.R. -- (Bankr. D. Mass, Feb. 12,

2007) (Feeney, J.); Arcari v. Marder (In re Arcari), 225 B.R. 253, 255 (Bankr. D. Mass.

1998); In re Inter-Island Vessel Co., 98 B.R. 606, 608 (Bankr. D. Mass. 1988).  The Debtor

has submitted to this Court copies of relevant Agreements that, if interpreted as the Debtor

urges, would preclude the Distributors' recovery on their asserted Claims.

Because the Debtor has met this initial burden, this Court must confront "the

question of which party bears the ultimate burden of proof."  Thinking Machs. Corp. v. New

Mexico Taxation & Revenue Dept., 211 B.R. 426, 429 n.2 (D. Mass. 1997).  This question

may only be answered by looking to the substantive law applicable to the underlying

dispute that would apply outside the bankruptcy context.  See, e.g., Internal Revenue

Service v. Levy (In re Landbank Equity Corp.), 973 F.2d 265, 270 (4th Cir. 1992); Thinking

Machs., 211 B.R. at 429-30 (citing Butner v. United States, 440 U.S. 48, 55 (1979);

<u>Vanston Bondholders Protective Comm. v. Green</u>, 329 U.S. 156, 161 (1946)).[17]  At the

outset, it is imperative to note that the Distributors hail from various European countries,[18]

thus raising a potentially thorny choice-of-law problem.  <u>See, e.g.</u>, <u>In re Fraden</u>, 317 B.R.

24, 33 n.18 ("the Court must make the appropriate choice of law decision"). Fortunately,

however, a complex conflicts-of-laws problem is avoided in this case.

     The Distributors have not asserted that any foreign law governs the resolution of the

substantive issues raised by the Claims and Objection. Pursuant to Federal Rule of Civil

Procedure (the "Federal Rules") 44.1, made applicable to these proceedings by Bankruptcy

Rule 9017, "[a] party who intends to raise an issue concerning the law of a foreign country

shall give notice by pleadings or other reasonable written notice."  Fed. R. Civ. P. 44.1;

Fed. R. Bankr. P. 9017.  Having declined to do so, the Court need not consider the

applicability of any foreign laws to the present dispute. <u>Putnam Res. v. Pateman</u>, 958 F.2d

448, 463 n.19 (1st Cir. 1992).

     In the absence of any applicable foreign law, the Court can discern no option but to

apply the law of Massachusetts. This conclusion comports with the parties' apparent

---

[17] As the Fourth Circuit Court of Appeals has explained:

[T]he Bankruptcy Code, in most instances, while providing a forum and procedures
for an expedient dispute resolution, does not endeavor to supplant the substantive
law under which the claim against the estate (or for that matter any defenses,
counterclaims, or other rights claimed by either party to the dispute) arose.

<u>In re Landbank Equity</u>, 973 F.2d at 270. The parties have certainly not disputed this well-
established proposition.

[18] According to the addresses listed on the Agreements and powers of attorney, the
locations of the various Distributors are: Harfnar Jordur, Iceland (Donna ehf); Budapest, Hungary
(Innomed Medical); Kaufering Germany (GS Elektromed); Hoersholm, Denmark (Kivex); San Giogio
di Piano, Italy (Mortara Rangoni); Stirling, Scotland (Dolby); Zurich, Switzerland (Reavita); Linz,
Austria (Schiller); Vantaa, Finland (Fenno Medical); and Biltoven, Netherlands (Ortho-Medical).

assumptions as well, as both parties have defined the contours of their legal arguments primarily with reference to the Uniform Commercial Code and relevant Massachusetts case law.[19] Furthermore, the First Circuit Court of Appeals has held that, in the absence of contrary argument or notice under Federal Rule 44.1, parties "consent to having their dispute resolved according to the law of the forum." Carey v. Bahama Cruise Lines, 864 F.2d 201, 206 (1st Cir. 1988); see also Restoration Pres., 325 F.3d at 63 n.4. And common restrictions placed upon "de facto" application of local law do not apply here, as Massachusetts "bears a reasonable relationship to the dispute,"[20] and there is no evidence to suggest the parties are "conspiring to avoid the policies of any other sovereign whose laws might otherwise apply to the dispute." Carey, 864 F.2d at 206.

## C.    Contract Issues[21]

Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility. If, however, a contract is thought

---

[19] This is further supported by the language of the Agreements themselves. Although the Agreements do not contain a global choice of law provision, they do indicate that the parties intended that Massachusetts law apply to the resolution of disputes. Section 17.1 of the Agreements bound the parties to arbitrate their disputes, a contractual provision which, if enforceable in these proceedings, see In re Mirant Corp., 316 B.R. 234, 238-40 (Bankr. N.D. Tex. 2004), both parties have implicitly waived. See Tyco Int'l Ltd. v. Swartz, 422 F.3d 41 (1st Cir. 2005); Lomas v. Travelers Prop. Cas. Corp., 376 F.3d 23 (1st Cir. 2004); Restoration Pres. Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 60-62 (1st Cir. 2003); Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Local Union No. 633, 671 F.2d 38, 42-43 (1982). And Section 17.4 provided:

> The law of the Commonwealth of Massachusetts, USA . . . excluding the Convention on Contract for the International Sale of Goods, shall be the applicable substantive law. . . .

[20] The Debtor's principal place of business is, and at all times has been, located in Massachusetts. This location was the situs for all communications and activities associated with the Debtor and related to the underlying Agreements.

[21] The parties, and the Court, agree that the parties contracted for the sale of goods; thus Article 2 of the Uniform Commercial Code, as adopted by Massachusetts, see M.G.L. ch. 106, § 2-101 et seq., governs their contractual disputes.

ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists. Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken. Determining whether or not a contract is ambiguous is, like other questions of contract construction, a matter for the court.

Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989) (citations omitted); see also Liberty Mutual Ins. Co. v. Greenwich Ins. Co., 417 F.3d 193, 197 (1st Cir. 2005); Boston Helicopter Charter, Inc. v. Augusta Aviation Corp., 767 F. Supp. 363, 369-70 (D. Mass. 1991). The issues raised by the parties present questions of both law and of fact. Portions of the dispute may be resolved purely as a matter of law; others remain to be established through an evidentiary hearing. The following discussion will hopefully aid the parties in focusing on the legal and factual issues that remain to be decided.

### 1.   Limitations on Remedy and Failure of Essential Purpose

Before pressing on to examine whether the Debtor has breached any provisions of the Agreements and which, if any, damages flow from the alleged breach, it seems appropriate to first determine whether some or all of the asserted damages are precluded by operation of law under the terms of the Agreements.

Under the Debtor's most broad-sweeping argument, the Distributors are entirely barred from recovering monetary damages, as their sole remedy in the event of the Debtor's breach was to terminate the Agreements pursuant to Section 11.2. Relying on UCC § 2-719 and the comments thereto, the Distributors have responded by arguing that

such a remedy fails of its essential purpose, as under the circumstances, they would in effect be left with no remedy.[22]

Under Massachusetts law, parties to contracts for the sale of goods are free to shape their own remedies through contract negotiation and drafting.  See Canal Elec. Co. v. Westinghouse Elec. Corp., 756 F. Supp. 620, 625-26 (D. Mass. 1990); M.G.L. ch. 106, § 2-719 cmt.1.  Pursuant to § 2-719, a contract for the sale of goods "may provide for remedies in addition to or in substitution for those provided in [Article 2] and may limit or alter the measure of damages recoverable under [Article 2]. . . ." M.G.L. ch. 106, § 2-719(1).  The parties' freedom to contract away all remedies is circumscribed, however, by subsection (2), which provides:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

M.G.L. ch. 106, § 2-719(2).  Thus, the Debtor and the Distributors have devoted considerable effort toward persuading this Court that the limited remedy of contract termination either does, or does not, fail of its essential purpose.

The Court concludes, however, that the question of whether the remedy has failed of its essential purpose is really *not* a question at all.  "Before considering the enforceability of a limited remedy, the court must first 'establish[ ] that the contract contains "an exclusive or limited remedy."'" Myrtle Beach Pipeline Corp. v. Emerson Elect. Co., 843 F. Supp. 1027, 1041 (D.S.C. 1993) (quoting Chatlos Sys., Inc. v. Nat'l Register Corp., 635 F.2d

---

[22] See M.G.L. ch. 106, § 2-719(2) & cmt.1 ("it is of the very essence of a sales contract that at least minimum adequate remedies be available . . . where an apparently fair and reasonable clause because of the circumstances fails in its purpose or operates to deprive either party of the substantial value of their bargain, it must give way to the general remedy provisions of [Article 2].").

1081, 1085 (3d Cir. 1980), <u>cert. dismissed</u>, 457 U.S. 1112 (1982); UCC § 2-719(1)(b)).

Under § 2-719(1)(b), remedies provided by a contract are optional, and cumulative, "unless

the remedy is *expressly* agreed to be exclusive, in which case it is the sole remedy." M.G.L.

ch. 106, § 2-719(1)(b) (emphasis added); <u>see also</u> Roy Anderson, <u>Contractual Limitations</u>

<u>on Remedies</u>, 67 Neb. L. Rev. 548, 557-59 (1988), <u>reprinted from</u> Roy Anderson, <u>Damages</u>

<u>Under the Uniform Commercial Code</u> (Callaghan 1988).

The remedy of contract termination pursuant to Section 11.2 is simply not an

exclusive remedy under the Agreements.  Section 11.2 does not expressly provide that

termination of the contract is the sole or exclusive remedy in the event of a breach. Rather,

it states that "either party *may* terminate this Agreement" (emphasis added).  The use of

the word "may" is clearly permissive[23] – the parties had the option to terminate the contract

as a remedy for the other party's breach, but were not required to do so. <u>See</u> <u>Myrtle Beach</u>

<u>Pipeline</u>, 843 F. Supp. At 1041; <u>Lincoln Pulp Paper Co., Inc. v. Dravo Corp.</u>, 436 F. Supp.

262, 276 (D. Me. 1977).  They could, as they in effect have, seek other remedies provided

by Article 2 in the event of a breach.

### 2.    <u>Contractual Limits on Liability</u>

Although the Distributors are not limited to termination of the contract as remedy for

the Debtor's breach, Sections 15.1 and 15.2 both contain language limiting the Debtor's

---

[23] <u>See, e.g.</u>, <u>Liberty Mutual v. Greenwich Ins.</u>, 417 F.3d at 197 & n.3 ("Under both case law and general usage, the term "may" indicates something that is permissive . . . .") (citing Massachusetts cases).

*liability* under the Agreements.[24]   Section 15.1 limits the types of damages recoverable

under the Agreements, and provides that "neither party will be liable for any lost profits or

for any indirect, incidental, consequential, punitive or other special damages. . . ." Section

15.2, in turn, limits the total amount of damages recoverable by providing that "in no event

will Access CardioSystems's total cumulative liability . . . exceed the total amount paid by

Distributor to Access CardioSystems . . . ."  The validity of these two provisions has not

really been contested, and the Court concludes that both provisions are enforceable.

Although Article 2 of the UCC provides that incidental and consequential damages

are recoverable, M.G.L. ch. 106, §§ 2-714(3), 2-715; Hendricks & Assoc., Inc. v. Daewoo

Corp., 923 F.2d 209, 213-14 (1st Cir. 1991) (applying and citing cases under

Massachusetts law), parties may limit their liability for such damages in accordance with

§ 2-719(3). M.G.L. ch. 106, § 2-719(3).[25]  The Distributors do not claim that the exclusion

---

[24] To the extent the Debtor relies on Section 11.6 of the Agreement, which provides that the parties will not be liable for damages of *any kind* (including, presumably, direct damages), this Court finds that the limitation is inapplicable.  Section 11.6 limits liability of the parties "on account of termination or expiration . . . *in accordance with* this Section 11" (emphasis added).  The Debtor has presented no colorable argument that the Agreements were terminated in accordance with Section 11, and the Distributors clarified at the hearing on the Objection that they were not seeking damages arising from the termination or expiration of the agreements.  Instead, the Distributors allege a breach of Section 9.3.  Thus, this Court must look to generally applicable provisions of the Agreements to determine contractual limits of liability.

[25] Section 2-719(3) provides:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

M.G.L. ch. 106, § 2-719(3).  Comment 3 to that section reinforces the validity of consequential damage limitations in the commercial context:

Subsection (3) recognizes the validity of clauses limiting or excluding consequential damages but makes it clear that they may not operate in an unconscionable

27

of incidental and consequential damages is unconscionable, nor, does it seem, could they.

Clearly, all the parties here are commercially sophisticated, and the liability limitations

created by Section 15.1 "simply reflect[ ] a decision by highly sophisticated business

entities about how to allocate certain risks . . . ." Canal Elec. Co. v. Westinghouse Elec.

Co., 973 F.2d 988, 996 (1st 1992); see also Logan Equip. Corp. v. Simon Aerials, Inc., 736

F. Supp. 1188, 1195-96 (D. Mass. 1990) (citing and quoting Canal Elec. Co. v.

Westinghouse Elec. Corp., 548 N.E.2d 182, 185, 406 Mass. 369 (1990); American Elec.

Power Co. v. Westinghouse Elec. Corp., 418 F. Supp. 435, 458 (S.D.N.Y. 1976)).

Likewise, the Court finds that Section 15.2, which limits damages to the price paid

by the Distributors, pursuant to Section 15.2, is enforceable.  Again, there is no contention

that the provision is unconscionable.  And, to the extent the Distributors' argument

regarding failure of essential purpose is aimed at this limitation, the Court finds no such

failure.[26] Such limits have been routinely upheld and provide a minimum adequate remedy,

---

manner. Actually such terms are merely an allocation of unknown or undeterminable
risks. . . .

Id. at cmt.3.

[26] It is far from clear whether the Distributors' allege that the limitations on liability under
Section 15.2 fail of their essential purpose.  In order to lay the issue to rest, however, the Court
notes that, under the present circumstances, it is inclined to agree that:

A clause limiting damages to the purchase price should never fail of its essential
purpose. Like exclusions of consequential damages and modifications of warranty,
a damage ceiling may not create an "exclusive or limited remedy" within the
meaning and purview of section 2-719(2).  In any event, since its only apparent
purpose is to exclude resultant damages, it will "fail" only if a court refuses to
enforce it. . . . [This type of] clause generally leaves the buyer the value of his
bargain (measured by the parties as the price of the goods) and . . . at the outset
permits a fair quantum of remedy (the value of the bargain).  When a remedy's
purpose includes loss allocation, it does not fail merely because loss occurs.

Andrew M. Baker et al., Special Project: Article Two Warranties in Commercial Transactions, 64

"even when . . . damages exceed[ ] the total contract price." <u>Canal Elec. Co.</u>, 548 N.E.2d

at 185 (<u>citing</u> <u>Deerskin Trading Post, Inc. v. Spencer Press, Inc.</u>, 495 N.E.2d 303, 398

Mass. 118 (1986)); <u>accord</u> <u>Canal Elec. Co.</u>, 973 F.2d at 996; <u>Sunny Indus.</u>, 1999 U.S. App.

LEXIS 7001 at *29 (Illinois law) (<u>citing JOM, Inc. v. Adell Plastics, Inc.</u>, 151 F.3d 15, 28 (1st

Cir. 1998)); <u>Pig Improv't Co., Inc. v. Middle States Holding Co.</u>, 943 F. Supp. 392, 402 n.14

(D. Del. 1996); <u>Ritchie Enter. v. Honeywell Bull, Inc.</u>, 730 F. Supp. 1041, 1049 (D. Kan.

1990) (Massachusetts law); <u>Posttape Assoc., Inc. v. Eastman Kodak Co.</u>, 450 F. Supp.

407, 411 (E.D. Pa. 1978) (Pennsylvania law).

In sum, the Court finds that the contractual limitations on liability found in Sections

15.1 and 15.2 of the Agreements are enforceable.  The Distributors may recover for direct

damages proved as resulting from the Debtor's breach of the recall provisions, but in any

event in an amount no greater than that paid by each Distributor under their respective

Agreements.  Recovery of any amount depends, of course, on the Distributors' ability to

prove their damages are direct damages as a result of a breach.  This, in turn, assumes

a successful showing that the Debtor breached the Agreements, a topic to which we now

turn.

---

Cornell L. Rev. 30, 239-41 (1978); <u>accord</u> <u>Sunny Indus., Inc. v. Rockwell Int'l Corp.</u>, 1999 U.S. App.
LEXIS 7001, *29, 38 U.C.C. Rep. Serv. 2d (Callaghan) 827 (7th Cir. 1999) ("Under the UCC, a
remedy does not fail of its essential purpose simply because one party struck a bad bargain that
it later regrets. . . . Moreover, it 'does not mean that an exclusive remedy has failed "of its essential
purpose" whenever a contracting party loses money because a limited remedy provision prevents
him from being fully reimbursed for the damages caused by the other party's breach.'") (<u>quoting</u> <u>J.D.
Povlak, Ltd. v. William Davies Co., Inc.</u>, 351 N.E.2d 243, 246, 40 Ill. App. 3d 1 (Ill. App. Ct. 1976)).

3. <u>Breach of Contract</u>

As alluded to above, the Distributors contend that the Debtor breached two contractual obligations under Section 9.3 of the Agreements, which section governs the parties' rights and obligations in the event of the recall of the Access AEDs.  For the reasons discussed below, the Court determines that it has insufficient evidence to decide whether the Debtor has breached the Agreements and, if so, the amount of damages incurred as a direct result.

The Distributors first argue that the Debtor breached Section 9.3 by failing to conduct the recall "in accordance with the recall, correction and customer notification policy and procedures maintained by Access CardioSystems."  The evidence provided on this issue is inconclusive, at best.  Two documents have been appended to the parties' pleadings in an effort to bolster their assertions that the Debtor either did or did not comply with its policy.  The Distributors produced a document purported to be an excerpt from the Debtor's "Quality System Manual" with the heading "Corrective and Preventive Action." The Debtor has produced a copy of an Establishment Inspection Report issued by the FDA in conjunction with the recall.  These documents do not, taken together, establish whether the manual excerpt constitutes the "policy" referred to under the contract.  Nor does the FDA report establish whether the Debtor's actions complied with the *Debtor's* policy.

Additionally, the Court has no guidance from the Distributors as to which damages it asserts flow directly from the alleged breach.  Therefore, material issues of fact remain regarding the content of any such policy maintained by the Debtor and whether the Debtor acted in conformity with that policy.  And, assuming that the Debtor did not conduct the

recall in accordance with its own policy, material issues of fact remain with regard to whether the Distributors suffered damages as a direct result of that breach.

The Distributors also allege that the Debtor breached the implied covenant of good faith and fair dealing through its unresponsiveness in the wake of the recall and its failure to approve the Distributors' associated costs.  Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Assoc., 583 N.E.2d 806, 820, 411 Mass. 451 (1991) (quoting Warner Ins. Co. v. Commissioner of Ins., 548 N.E.2d 188, 192 n.9, 406 Mass. 354 (1990)); see also M.G.L. ch. 106, § 1-203 ("Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.").  The obligation of good faith under Massachusetts law prohibits parties from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." Druker v. Roland Wm. Jutras Assoc,, Inc., 348 N.E.2d 763, 765, 370 Mass. 383 (1976) (citations omitted).

The obligation of good faith finds particular application in contracts that contain a condition precedent to a contracting party's obligation under the contract.  The Court agrees in principle with the Debtor that the Distributors had to obtain approval of costs associated with a recall before the Debtor would be obligated to reimburse those costs. Thus, approval of costs was a condition precedent to recovery under Section 9.3.[27]

---

[27]   Under Massachusetts law,

A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises under the contract.  See Malden Knitting Mills v. United States Rubber Co., 301 Mass. 229, 233 (1938); Wood v. Roy Lapidus, Inc., 10 Mass. App. Ct. 761, 763 n.5 (1980).  If the condition

31

Likewise, a second condition on reimbursement is found in that section.  In addition to obtaining approval for costs incurred in connection with the recall, the Distributors were required to submit documentation of those costs prior to reimbursement.

The Debtor asserts that the Distributors failed to fulfill either condition, thus precluding recovery under Section 9.3.  Whether couched in terms of the covenant of good faith and fair dealing, or labeled the "prevention doctrine," Massachusetts law is clear: a party that prevents the other from satisfying a condition precedent cannot rely on the failure of the condition to avoid its own obligations under a contract.  See Ne. Drilling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 40 (1st Cir. 2001);  N. Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, (1st Cir. 1988); State Fuel Co. v. Gulf Oil Corp., 179 F.2d 390, 397-98 (1st Cir. 1950);  Fortune v. The Nat'l Cash Register Co., 364 N.E.2d 1251, 1259, 373 Mass. 96 (1977).  Some courts have relied upon the covenant of good faith and fair dealing to reach this conclusion. See, e.g., Bradford Dyeing Assocs., Inc. v. J. Stog Tech GmbH, 465 A.2d 1226, 1237-38 (R.I. 2001).  Others have cited the "prevention doctrine."  See, e.g., Ne. Drilling, 243 F.3d at 40.  Either way, the conclusion here is the same: if the Debtor made it impossible for the Distributors to obtain, or if the Debtor in bad faith withheld, the

---

is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced. See generally 5 S. Williston, Contracts § 663 (3d ed. 1961 & Supp. 1990); Restatement (Second) of Contracts § 255 (1981).

Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 288, 411 Mass. 39 (1991). Although the parties did not use traditional wording, such as "provided that," to create the condition precedent, the Court still finds that a condition precedent was intended after considering "the words used by the parties, the agreement taken as a whole, and surrounding facts and circumstances." Id. at 45-46; see also Malden Knitting Mills v. U.S. Rubber Co., 16 N.E.2d 707, 710, 301 Mass. 229 (1938).  Considering the structure and the wording of Section 9.3, with some light shed by the parties' pleadings as to their intent with regard to that provision, the Court finds that approval of costs was a condition precedent to reimbursement.

necessary approval of reasonable costs associated with the recall, the Debtor cannot now rely on that failure to avoid its obligation to reimburse those expenses.

Two further arguments raised by the Debtor must be addressed.  First, the Debtor has argued that the Distributors may not avail themselves of the "good faith" argument, because the Distributors did not first comply with *their* obligations under the Agreements. According to the Debtor, the Distributors were obligated, under Section 9.3, to provide documentation of all reasonable and necessary costs *before* the Debtor's obligation to approve such expenses would arise.  But this is not so.  Section 9.3 says that the Debtor "shall promptly reimburse all reasonable necessary and documented costs for any recall . . . that are *incurred* by Distributor *with the prior approval* of [the Debtor]" (emphasis added).  Logically read, this provision indeed required the Distributors to obtain approval from the Debtor.  That approval, however, would need to be obtained *before* such costs were incurred.[28]  The Distributors were thus not required to produce documentation of their costs in order to obtain approval, but were required to provide the necessary documentation to ultimately receive prompt reimbursement of approved expenses – a production that will need to be met before their Claims can be allowed on this basis.

The Debtor also says the Distributors are precluded from recovery under Section 9.3 because they failed to communicate their requests for approval in accordance with Section 18.3 of the Agreements, which provides,

---

[28] The prepositional phrase "by Distributor" modifies the verb "incurred."  Likewise, the words "with the prior approval of the Debtor" constitute a separate prepositional phrase that also modifies the verb "incurred."  Therefore, reimbursable costs were those incurred "with prior approval" – i.e., *after* approval had been obtained.

> All notices and demands hereunder will be in writing and will be send [sic] by a reputable international express courier to the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party) . . . .

But Section 9.3 does not require the Distributors to seek approval of necessary expenses via the type of notice or demand that appears to be contemplated by Section 18.3. The request for approval, unlike, perhaps, a request for reimbursement, does not clearly constitute a "demand" within the normal usage of the word. Furthermore, if the parties had contemplated that requests for approval required "notice" pursuant to Section 18.3, they could have specified as such by using the word "notice" or "written notice" as they did in many other provisions of the Agreements.[29]

To recapitulate: the Court rules that the limitations on liability under Sections 15.1 and 15.2 are enforceable and the Distributors' recovery is capped to the amounts paid by each Distributor pursuant to its individual agreement with the Debtor. However, material issues of fact remain on the following issues: (1) the content of the Debtor's policies regarding recall procedures; (2) whether the Debtor did or did not comply with its recall policies; (3) assuming the Debtor failed to comply with its recall policies, the direct damages, if any, incurred by the Distributors as a result of that failure; (4) whether the Distributors' failure to obtain approval of costs associated with the recall was a result of the Debtor's actions; (5) assuming the Debtor prevented the Distributors from obtaining

---

[29] The Court refers, for example, to Section 1.1 ("Access CardioSystems shall notify Distributor"), Section 3.3 ("upon . . . advance written notice"), Section 5.4 ("where Distributor has given Access CardioSystems written notice" and "Access CardioSystems will give Distributor written notice"), Section 6.1 ("upon at least sixty (60) days' prior written notice"), Section 6.2 ("may be cancelled . . . by written notice"), Section 6.6 ("upon written notice"), Section 9.1 (Distributor . . . will notify Access CardioSystems in writing"), Section 9.2 ("Access CardioSystems will provide written notice"), Section 11.2 ("following written notice"), Section 13.1 ("prompt written notice").

34

necessary approval, whether the Distributors have incurred reasonable, necessary and documented costs associated with the recall.

### D.    Indemnification

The Distributors assert that, quite separate from their breach of contract allegations, they are entitled to indemnification from the Debtor for amounts they have expended to settle end-users' claims related to the Access AEDs.  Under Massachusetts law, however, the Distributors are not entitled to indemnification in these circumstances.

As the First Circuit Court of Appeals has so succinctly explained,

> Three different sets of circumstances may give rise to a right to indemnification. First, an express agreement may create a right to indemnification. W. Prosser, Law of Torts § 51  (4th ed. 1971). Second, a contractual right to indemnification may be implied from the nature of the relationship between the parties. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 133-34, 100 L. Ed. 133, 76 S. Ct. 232 (1956). Third, a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties. Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 718 (2d Cir. 1978); W. Prosser, Law of Torts § 51.

Araujo v. Woods Hole, 693 F.2d 1, 2 (1st Cir. 1982); see also Coons v. A.F. Chapman Corp., 460 F. Supp. 2d 209, 223-24 (D. Mass. 2006); Leasetec Corp. v. Inhabitants of the Cty. of Cumberland, 896 F. Supp. 35, 38-39 (D. Me. 1995) (applying Massachusetts law) Rathbun v. W. Mass. Elec. Co., 479 N.E.2d 1383, 1384-85, 395 Mass. 361 (1985); Decker v. Black & Decker Mfg. Co., 449 N.E.2d 641, 643-45, 389 Mass. 35 (1983); Hollywood Barbecue Co. v. Morse, 50 N.E.2d 55, 56, 314 Mass. 368 (1943);  Larson v. Landvest, Inc., 2005 Mass. Super. LEXIS 315, *16-18, 19 Mass. L. Rep. 479 (Mass. Super. Ct., June 3, 2005); Clark v. Gen. Inv. & Dev. Co., 1999 Mass. App. Div. 205, 206-07, 1999 Mass. App. Div. LEXIS 80 (Mass. App. Div. 1999); Nicholas P. Alexander, Developments in Indemnity Law: Express, Implied Contractual, Tort-Based and Statutory, 79 Mass. L. Rev. 50 (1994).

35

The Distributors do not argue that the principles of either express or implied contractual indemnification apply here.[30]  Rather, they assert that they are entitled to indemnification under the "common law."  Although the term "common law" indemnification has occasionally been used by the courts, the more appropriate term under Massachusetts law is "tort-based indemnification." Clark v. Gen. Inv., 1999 Mass. App. Div. at 207 n.5. And therein lies the rub.  To recover under tort-based indemnification principles, the party seeking indemnification must establish "a tort-based right where one party is held derivatively or vicariously liable for the wrongful act of another." Larson v. Landvest, 2005 Mass. Super. LEXIS 315 at * 16; see also Fireside Motors, 479 N.E.2d at 1388; Decker, 449 N.E.2d at 644-45 ("This right to indemnify is limited to those cases in which the would-be indemnitee is held derivatively or vicariously liable for the wrongful act of another.") (citing Stewart v. Roy Bros., 265 N.E.2d 357, 358 Mass. 446 (1970); Hollywood Barbecue, 50 N.E.2d 55; Gray v. Boston Gas Light Co., 114 Mass. 149 (1873); Lowell v. Boston & Lowell R.R. Corp., 23 Pick. 24 (1839)).

Here, there is no evidence of an underlying tort for which the Distributors have been held vicariously liable.  Although the Distributors refer to the Debtor's having "negligently" manufactured the AEDs, there is no assertion that the Distributors have settled negligence

_____

[30] Although the Agreements did provide for indemnification for certain intellectual property claims, that provision explicitly limited indemnification to circumstances not relevant here.  No provision of the Agreements provides for indemnification under the present circumstances, and there are no "unique special factors" present that would indicate "the parties intended that the [Debtor] bear the ultimate responsibility" for the types of claims asserted by the Distributors. Araujo, 693 F.2d at 2; see also Coons, 460 F. Supp. 2d at 223-24; Leasetec, 896 F. Supp. at 38-39; Fall River Housing Auth. v. H.V. Collins Co., 604 N.E.2d 1310, 1313, 414 Mass. 10 (1992); Fireside Motors, Inc. v. Nissan Motor Corp., 479 N.E.2d 1386, 1391, 395 Mass. 366 (1985); Decker, 449 N.E.2d at 643; Croall v. Mass. Bay Transp. Auth., 526 N.E.2d 1320, 1322, 26 Mass. App. Ct. 957 (Mass. App. Ct. 1988); Oats v. Diamond Shamrock Corp., 503 N.E.2d 58, 59, 23 Mass. App. Ct. 446 (Mass. App. Ct. 1987)

36

claims with end-users,[31] nor is there any allegation that an end-user suffered personal injury damages which the Distributors settled.  As the First Circuit Court of Appeals has recently noted, the "common law indemnity doctrine has been recognized only in personal injury tort actions." Nicolaci v. Anapol, 387 F.3d 21, 27 (1st Cir. 2004); see also Effanzee Assoc. v. Thermo Electron Corp., 1994 U.S. Dist. LEXIS 773, *25-26 (E.D. Pa. 1994) (where underlying action not based in tort, no right to indemnification under Massachusetts common law); Leasetec, 896 F. Supp. at 39 (same).  Thus, because the Distributors have not been held vicariously or derivatively liable on any underlying tort claims, they are not entitled to indemnification from the Debtor for the claims asserted by the end-users.

In fact, the Distributors seek recovery for solely economic and commercial loss – both their own and the end-users'.  Indemnification under a tort-based theory is not available where the only losses are economic, and tort-based theories cannot be used to avoid monetary repercussions associated with contractual allocations of risk. MacGlashing v. Dunlop Equip. Co., 89 F.3d 932, 937 (1st Cir. 1996) ("Massachusetts law . . . adopts the majority view which draws a clear distinction between tort recovery for physical injury and contract recovery for economic loss"); see also E River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986); W.R. Constr. & Consulting, Inc. v. Jeld-Wen, Inc., 2002 U.S. Dist. LEXIS 18686, *18 (D. Mass. 2002); Logan Equip. Corp. v. Simon Aerials, Inc., 736 F.

---

[31] In fact, the Distributors rely heavily on their allegations that they settled claims with end-users based on the Debtor's failure to honor the end-users' warranties.  Warranty claims, however, are not tort claims. On an additional note, there is no evidence that the Distributors discharged any claims for which they were liable *by operation of law*.  See, e.g., Decker, 449 N.E.2d at 644; Elias v. Unisys Corp., 573 N.E.2d 946, 410 Mass. 479 (1991); Larson, 2005 Mass. Super. LEXIS 31, *15-16 (quoting Santos v. Chrysler Corp., 715 N.E.2d 47, 430 Mass. 198 (1999)).  They may well have settled their customers' claims in order to preserve good will or a favorable business reputation, but these sorts of voluntary payments do not give rise to indemnification rights under Massachusetts law.

37

Supp. 1188, 1198 (D. Mass. 1990); <u>Hart Eng'g Co. v. FMC Corp.</u>, 593 F. Supp. 1471, 1482 (D.R.I. 1984) (collecting cases); <u>Bay State-Spray v. Provincetown Steamship, Inc.</u>, 533 N.E.2d 1350, 1353, 404 Mass. 103 (1989); <u>Marcil v. John Deere Indus. Equip. Co.</u>, 403 N.E.2d 430, 433-34, 9 Mass. App. Ct. 625 (Mass. App. Ct. 1980).   Thus, as there is no underlying  tort, there is no right to tort-based indemnification. <u>Accord</u> <u>Fortune View Condominium Assoc. v. Fortune Star Dev. Co.</u>, 90 P.2d 1062, 1068 (Wash. 2004) (where underlying claim was for economic loss, party seeking indemnification could not proceed under tort-based indemnification theory).

IV.     CONCLUSION

        For the reasons discussed above, the Court can presently neither sustain nor overrule the Objection in its entirety.  The Distributors are entitled to an evidentiary hearing on their breach of contract claims and to determine the amount of their direct damages, if any.  However, pursuant to the parties' Agreements, the Distributors may not recover incidental and consequential damages on account of any established breach, and the total of all damages shall not exceed the amounts paid by the Distributors under the relevant Agreements.  Furthermore, the Distributors are not entitled to indemnification on account of amounts paid to settle the claims of end-users.  An order in conformity with this memorandum shall issue forthwith.

Dated: February 16, 2007                        Henry J. Boroff
                                                United States Bankruptcy Judge